UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 24-cr-220 (RDM) |
| | : | |
| CHRISTINA CHAPMAN, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through undersigned counsel, hereby submits this sentencing memorandum for defendant Christina Chapman (hereinafter "Defendant"). The government recommends a sentence at the high end of the sentencing range agreed upon by the parties pursuant to the plea agreement entered under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, that is, a total sentence of 111 months of incarceration, 36 months of supervised release, and a special assessment of $300. The government also requests a money judgment in the amount of $176,850 (the amount Defendant charged her co-conspirators for her services in the scheme).[1] This sentence reflects the seriousness of Defendant's criminal conduct, her role in the conspiracy, and her obstruction of the investigation after her criminal acts. As explained herein, the requested sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).

**PROCEDURAL HISTORY**

On May 8, 2024, a grand jury indicted Defendant with Conspiracy to Defraud the United States, in violation of 18 U.S.C. § 371 (Count One); Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1349 (Count Two); Conspiracy to Commit Bank Fraud, in

---

[1] A filing regarding the money judgment and forfeiture request will be filed contemporaneously herewith.

violation of 18 U.S.C. §§ 1344, 1349 (Count Three); Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1) (Count Four); Conspiracy to Commit Fraud and Related Activity in Connection with Identification Documents, in violation of 18 U.S.C. §§ 1028(a)(7), (b)(1)(D), (c)(3)(A) & (f) (Count Five); Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) & (h) (Count Six); Prohibition of Unlicensed Money Transmitting Business, in violation of 18 U.S.C. § 1960 (Count Seven); and Unlawful Employment of Aliens, in violation of 8 U.S.C. § 1324a (Count Eight). The indictment also charged coconspirators John Doe 1, alias Jiho Han, John Doe 2, alias Haoran Xu, and John Doe 3, alias Chunji Jin, with Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) & (h).

On February 11, 2025, Defendant pled guilty pursuant to a Fed. R. Crim P. 11(c)(1)(C) to Counts Two, Four, and Six of the Indictment, and a term of imprisonment of 70 to 87 months on Counts Two and Six, followed by 24 months on Count Four. The Court accepted the plea and set Defendant's sentencing for June 16, 2025, which was continued at request of Defendant to July 16, 2025, and then to July 24, 2025.

## FACTUAL BACKGROUND

The relevant factual background is described in the Statement of Offense (ECF No. 23), incorporated herein by reference.

In general, since 2003, the Democratic People's Republic of Korea (North Korea) has been under sanction by the United Nations (U.N.) due to its testing and expansion of its nuclear weapons program. Since 2016, the United States has had comprehensive sanctions against North Korea, cutting it off from the U.S. financial system and limiting the ability of U.S. persons and companies to do business with North Koreans. As a result, North Korea has sponsored various subterfuge schemes evade U.N. and U.S sanctions to earn money for the regime. One such scheme involves

the use of thousands of highly skilled information technology (IT) workers to obtain remote employment with companies around the world, including the United States, using false, stolen, or borrowed identities. In order to circumvent controls put in place by U.S. companies to prevent hiring illicit overseas IT workers, the North Korean IT workers obtain assistance from persons residing in the U.S.

From in and around October 2020, until on or about October 26, 2023, the defendant, Chrsitina Chapman, a U.S. national, conspired with certain North Korean IT workers to perpetuate such a coordinated scheme to obtain remote work from U.S. companies. Specifically, this group of IT workers stole the identities of U.S. nationals; applied for remote jobs in the United States., causing the transmission of false documentation to the Department of Homeland Security (DHS); obtained jobs at hundreds of U.S. companies, to include Fortune 500 companies, often indirectly through staffing companies or other contracting organizations ("staffing companies"); received laptop computers and other hardware from U.S. companies through which they have access to the internal systems of the U.S. companies (generally, "laptops"); and was paid millions of dollars for their work, much of which has been falsely reported to the Internal Revenue Service (IRS) and the Social Security Administration (SSA) in the name of the actual U.S. persons whose identities were false, stolen, or borrowed.

Defendant served as a U.S.-based facilitator and provided the following support to the conspiracy, including but not limited to: (i) assisting the North Korean IT workers in validating stolen identity information of U.S. citizens so the IT workers could pose as U.S. citizens; (ii) receiving and hosting laptops issued by U.S. companies to the IT workers in her U.S. residences (a "laptop farm"), so that the companies believed the workers to be located in the United States, and sending other laptops from her residences to IT workers abroad; (iii) at her laptop farms,

logging into the U.S. companies' laptops and assisting the IT workers with connecting remotely, so it appeared that the logins were coming from the U.S.; and (iv) receiving paychecks for the IT workers at her home, forging the signatures of the beneficiary on the checks, and depositing them to her U.S. financial institution, thereafter further transferring the proceeds of the scheme to the IT workers. In exchange, Defendant charged monthly fees to the North Korean IT workers for her services, enriching herself off the scheme.

The conspiracy perpetrated a staggering fraud on a multitude of industries, at the expense of generally unknowing U.S. companies and persons. The coconspirators compromised the identities of 68 U.S. persons, creating false tax liabilities for these victims; applied for or obtained remote jobs at 309 U.S. companies and 2 international companies; and caused false information to be conveyed to DHS on more than 100 occasions. The IRS Special Agent who investigated the case estimated that the scheme generated at least $17.1 million of revenue for the North Korea.

## SENTENCING CALCULATION

### A. Statutory Maximums

**Count Two:** Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1349, carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of not more than three years; mandatory restitution under § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**Count Four:** Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1), carries a mandatory sentence of two years of imprisonment, that is to run consecutively to any other term of imprisonment; a fine not to exceed the greater of $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of not more than one year; mandatory restitution under

§ 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**Count Six:** Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h), predicated on conspiracy to violate 18 U.S.C. § 1956(a)(1)(B)(i), carries a maximum sentence of 20 years of imprisonment; a fine of $500,000 or twice the value of the property involved in the transactions; a term of supervised release of not more than three years; mandatory restitution under § 3663A; and an obligation to pay any applicable interest of penalties on fines and restitution not timely made.

**B.  Sentencing Guidelines Calculation**

Pursuant to the plea agreement, the parties agreed to a base offense level under the Sentencing Guidelines of 40, as follows:

Count 2: 18 U.S.C. § 1349

| | | |
|---|---|---|
| § 2B1.1 | Base Offense Level | 7 |
| § 2B1.1(a)(2)(A)(i) | 10 or More Victims | +2 |
| § 2B1.1(b)(10) | Sophisticated Means | +2 |
| | | (increase to 12) |
| § 3B1.1 | Aggravating Role | +4 |
| § 3C1.1(a) | Obstruction | +2 |
| | **Total** | **18** |

Count 4: 18 U.S.C. § 1028A

| | | |
|---|---|---|
| § 2B1.6 | Base Offense Level | N/A[2] |

---

[2] The Guidelines sentence is a two-year term of imprisonment required by the statute. *See* U.S.S.G. § 2B1.6.

<u>Count 6: 18 U.S.C. §§ 1956(a)(l)(B)(i) & (h)</u>

| | | |
|---|---|---|
| § 2S1.1(a)(2)[3] | Base Offense Level | 8 |
| § 2B1.1(a)(1) | Value of Funds Laundered | +18 |
| § 2S1.1(b)(2)(B) | Conviction of § 1956 | +2 |
| § 2S1.1(b)(2)(C) | Business of Laundering Funds | +4 |
| § 2S1.1(b)(3) | Sophisticated Laundering | +2 |
| § 3B1.1 | Aggravating Role | +4 |
| § 3C1.1(a) | Obstruction | +2 |
| | **Total** | **40** |

Counts Two and Six are grouped together for purposes of sentencing, pursuant to U.S.S.G. § 3D1.2(c); *see also* U.S.S.G. § 2S1.1, App. Note 6 ("In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of § 3D1.2 (Groups of Closely-Related Counts)."). Therefore, the total offense level is 40. The parties also agreed to a three-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1, making the agreed-upon estimated offense level 37.

When the plea agreement was offered by the government, the government had calculated the revenue generated for the IT workers under the scheme as $6.8 million. At that time, due to unavailability of certain financial records, the government had not yet calculated the total amount laundered. Government counsel noted in communications with defense counsel that the anticipated actual laundered amount would increase with additional investigation, once additional records were received. Following the receipt of those additional records, the government calculated the total revenue generated under the scheme as $17.1 million, an amount that was included in the Statement of Offense. *See* ECF No. 23 ¶ 10.

---

[3] The plea agreement entered into by the parties incorrectly cited subsection 2S1.3(a)(1). *See* ECF No. 22. The Guidelines calculation remains unchanged.

The Probation Office's draft Presentence Investigation Report (PSR) [4] calculated Defendant's guidelines for conspiracy to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and (h), using U.S.S.G. § 2S1.1, which provides that the base offense level is 8 plus the number of the offense levels from the table in § 2B1.1 corresponding to the value of laundered funds. The Probation Office used $17.1 million as the value of laundered funds for this calculation.

**SENTENCING RECOMMENDATION**

A district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).  The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 46-49.  The district court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  *Id.* at 49-50.  Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).  *United States v. Rita*, 551 U.S. 338, 347-50 (2007).

The § 3553(a) factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment; (3) the Sentencing Guidelines and related Sentencing Commission policy statements; and (4) the need to avoid unwarranted sentence disparities.

---

[4] At the time of filing, the Probation Office had not yet filed the final PSR. These comments reflect the government's analysis of the draft version.

The parties have submitted, and the Court accepted, a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C).  In the agreement, the parties stipulated to a sentence of incarceration of 70 to 87 months on Counts Two and Six, followed by 24 months on Count Four. While this sentencing range reflects a downward variance from the Guidelines sentencing range, the government believes it is appropriate, taking into account all of the sentencing factors in § 3553(a), particularly the statute's mandate that the "[C]ourt shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Despite the seriousness of Defendant's conduct and her integral role in the scheme, a variance is appropriate in this case, as Defendant only received a fraction of the overall proceeds laundered by her coconspirators. Additionally, although Defendant's actions were egregious, Defendant did not specifically attempt to raise revenue for the benefit of North Korea and alleged she was unknowing of the involvement of North Korean workers. Though Defendant obtains the benefit of a downward variance, the government recommends that Defendant be sentenced to the high end of the agreed upon range—for a total period of 111 months of incarceration. Such a sentence would most appropriately reflect and address the seriousness of Defendant's conduct, serve as a deterrent, and take account the need for just punishment.

### A.  The Nature and Circumstances of the Offense

#### 1.  North Korea IT Worker Scheme

The nature and circumstances of the offense are serious. The North Korea IT worker scheme uses thousands of highly skilled IT workers, who work remotely for U.S. and foreign companies, using false identities, and generate revenue that is funneled back to North Korea. The COVID-19 pandemic and the advent of 100% remote work positions in the United States has increased the number of U.S. jobs accessible to this threat group. Additionally, changes to hiring

practices and to employment eligibility verification rules have resulted in easier access for North Korea IT workers to obtain employment at the largest and smallest U.S. companies. A 2024 UN Panel of Experts report estimates that the technology sector continues to be a key moneymaker for North Korea with an estimated 3,000 North Korean IT workers abroad and another 1,000 more operating inside North Korea, generating $250-600 million annually, most of which is returned to the regime.[5]  Regardless of Defendant's own awareness of the involvement of North Korea in the scheme, the fact remains that the proceeds of the scheme, excluding the funds that Defendant was paid directly for her role ($176,850), went to individuals overseas in support of North Korea. While Defendant's conduct is egregious on its own, the national security implications of the scheme make the offense more serious in nature.

### 2. <u>Defendant's Role in the Scheme</u>

Defendant had an extensive role in almost every critical piece of the conspiracy and was an organizer of other individuals involved in the scheme. Defendant knew that the overseas IT workers were not authorized to work in the United States and that they were using false, stolen, or borrowed identities of real U.S. persons to apply for jobs. On or about February 25, 2022, Defendant provided a coconspirator overseas IT worker using the screenname "Joren Jo" with her debt card information and that she would add the charge to her invoice. *See* ECF No. 23 ¶ 11. On the same day, a coconspirator created an account with a Maryland-based online background check service provider using Defendant's identifying and debit card information. *Id*. This online background check service was used to query criminal history reports and conduct Social Security Number traces to assist in the use of U.S. person identities with U.S. employers. *Id*. (Defendant

---

[5] U.N. Security Council, Final Report of the Panel of Experts submitted pursuant to Resolution 2680 (2023), U.N. Doc. S/2024/215, at 50–51 (Mar. 7, 2024), https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/S%202024%20215.pdf.

later took back control of this account, showing her knowledge regarding the use of false identity information as part of the scheme.)

Defendant hosted laptop farms in her residences (in Minnesota and Arizona) for the co-conspirator North Korean IT workers. In support of the laptop farm operations, Defendant exchanged countless messages with the North Korean IT workers to set up their computers for login and remote access and troubleshoot issues. Defendant's laptop farm was operating at such a high volume that Defendant employed two assistants who worked out of her Arizona residence to assist with these activities. In and around October 2023, law enforcement seized over 90 laptops from Defendant's Arizona residence. The photographs below show how Defendant would organize and store U.S. company laptops in her home, to include notes with identifying information of the U.S. company and U.S. person identity associated with the laptop.





Defendant's operation of the laptops as part of her "laptop farm" was key to success of the scheme. For instance, on or about April 11, 2022, a coconspirator IT worker using the screenname "BH" asked Defendant if "[a]ny laptop was delivered under 'David S.'?" ECF No. 23, ¶ 13(d). Defendant responded that it had arrived. *Id*. BH wrote, "I want to access that remotely You know how to install Anydesk?" *Id*. Defendant responded, "I do it practically EVERYDAY!" *Id*. AnyDesk was one of the remote desktop applications used by Defendant and the overseas IT workers to control and share access to the laptops sent by U.S. employers and make it appear as though the overseas IT workers were operating from within the United States. Without Defendant's laptop farm, the U.S. companies would have denied access to the IT workers, as security rules generally prevented IT worker laptops from being used overseas or with a Virtual Private Network. Additionally, in instances where such security was not in place, Defendant sent her coconspirator IT workers' laptops to China, facilitating at least 49 laptop or device deliveries in this fashion. *See* Indictment ¶ 23(ggg) (1-49) (showing deliveries to China, Pakistan, UAE, and Nigeria).

On at least several occasions, Defendant facilitated the transmission of false information to U.S. government agencies. On or about August 2, 2023, Defendant acknowledged the severity of falsifying employment eligibility forms (i.e., the Form I-9) in a group message that included several coconspirator overseas IT workers, stating, "[i]n the future, I hope you guys can find other people to do your physical I9s. These are federal documents. I will SEND them for you, but have someone else do the paperwork. I can go to FEDERAL PRISON for falsifying federal documents." ECF No. 23 ¶ 14(b). All told, fraudulent information was transferred to the government through the employment verification process more than 100 times, and false tax and social security earnings information was transferred to the government, amounting to over $17.1 million in false wages claimed.

Defendant conspired with North Korean IT workers to devise and implement a scheme to deposit wages into her U.S. financial accounts and submit false information to the banks. For instance, in the messages below, sent between on or about October 5, 2023, and on or about October 19, 2023, with an overseas IT worker using the screenname, "Tommy," Defendant and Tommy discuss how to deposit wages for U.S. identity "Andy P." into Defendant's financial account. ECF No. 23 ¶ 18(d). After speaking with the bank about their requirements, Defendant tells Tommy, "[y]our friend here needs to go get a sim card, saying he's buying it for his friend Andy P[.] so it gets put in his name. If the bank asks about the new number, he can just say he moved recently. . . Alternatively, your friend can get a Lan line in Andy's name. You guys obviously have a social security number for him. That would be registered in his name. . . ." *Id*. These messages show how integral Defendant was at directing the conspirators. Additionally, Defendant accepted paychecks on behalf of the IT workers in names other than their own. She forged the name of the real U.S. person when she signed the beneficiary on those checks, deposited

12

them into her U.S. financial accounts, and then transferred those funds into accounts controlled by the overseas IT workers. ECF No. 23 ¶ 19. From identifying and authenticating the U.S. person identities that were used by the IT workers, to ensuring that their wages were transferred to individuals overseas, Defendant's role went beyond simply running the laptop farm. Defendant had an integral role in each part of the scheme, even assisting with refining and troubleshooting tactics used by the conspirators to deceive U.S companies and financial institutions.

### 3.  **Victim Impact**

The victim impact by this fraud is significant. This case involves one of the largest North Korean IT worker fraud schemes charged by the Department of Justice, with 68 U.S. person identities stolen and 309 U.S. businesses and 2 international businesses defrauded. (An updated list of the identities of all the victims has been provided to defense counsel).

The impact on U.S. persons whose identities were stolen is significant. These U.S. persons had false tax liabilities created in their name, which they will have to handle through ongoing discussions with the IRS and SSA. For instance, one U.S. person was denied unemployment benefits because a coconspirator IT worker was using their Social Security Number and thus the unemployment could not be verified. The victims' identities are now flagged within the government's employment eligibility database, creating additional hassles for these victims to prove their identities when they obtain employment. Online / social media personas of the U.S. person victims persist, further complicating their efforts to regain control of their identities.

The impact on U.S. businesses is also significant. First, the fact that U.S. companies had technologically-savvy North Korean insiders accessing their sensitive IT systems generally caused

U.S. companies to have to conduct internal and costly security reviews.[6] Second, some U.S. companies had their data stolen by an IT worker, causing further internal security review. *See* Indictment ¶5, 23(xx). Third, the U.S. companies lost valuable property as law enforcement was not able to recover many of the devices used in the scheme.[7]

### B.  The History and Characteristics of the Offender

Although Defendant has no criminal history, her first criminal conviction was not one of a single, impulsive act. Beginning at least in and around October 2020, through on or about October 26, 2023, Defendant was an active member of the criminal conspiracy, completing daily actions to keep the complex scheme in operation. Defendant knew that she was committing fraud, and generally commented about the fraud to her coconspirators. Defendant alleged she was unknowing of the involvement of North Korean workers, although the government notes that over an eight-month period, Defendant sent thirty-five packages to Dandong, China, a city on the border with North Korea. *See* Indictment ¶ 23 (ggg) (1-26, 30-33, 42-46).

Additionally, despite her limited criminal background, Defendant willfully obstructed the investigation when she deleted conversations with her coconspirators after learning that the FBI was executing a search warrant at her residence. Below are excerpts from the draft transcript of Defendant's November 1, 2023, interview with the FBI, where she admitted to this conduct.

---

[6] *E.g.*, Jasper Sleet: North Korean remote IT workers' evolving tactics to infiltrate organizations, Microsoft Security Blog, *available at* https://www.microsoft.com/en-us/security/blog/2025/06/30/jasper-sleet-north-korean-remote-it-workers-evolving-tactics-to-infiltrate-organizations/ (last visited July 7, 2025) (discussing remediation steps).

[7] The government has advised victims of their right to attend sentencing, seek restitution, and make a victim impact statements, and will provide all such statements to defense and the Court prior to sentencing. The government notes that, due to the nature of the North Korean-backed fraud, many victims have expressed hesitation in coming forward at sentencing.

**Chapman**: I didn't know or understand what was going on. Because on the flight there I as contacted by someone who said they were an FBI agent on the phone. So I thought it as partially a joke at first, and then they contacted me first, saying there were issues with the computers, they couldn't connect to them, I said it was probably the router, every now and then the router would reset, then ▮ messaged me, and then, they kept on sending messages in the assistance chat that I set up and I finally said in our main chat, shut the fuck up the FBI is at my house [crying]. And then they didn't even believe it and I noticed that some people even were leaving the chat , [crying] like they knew and then one of them DM me and said delete everything and I as like what do you  mean delete everything |

. . .

**SA Cody**: So when they tell you to delete everything what did you do

**Chapman**: Deleted some of the stuff from Skype, then I stopped deleting some of the stuff from skype

**SA Cody**: Then how did you delete it if your work phone was here?

**Chapman**: I had Skype on my other phone for a little while just when I was traveling

**SA Cody**: How much did you delete form Skype?

**Chapman**: I don't know, maybe 10 conversations; But I looked it up it can be recovered

The draft PSR notes that Defendant had a difficult and troubling childhood that was compounded by abuse. PSR ¶ 88-91. As an adult, Defendant has experienced mental and emotional health issues, including diagnoses of generalized anxiety disorder, major depressive disorder, and adjustment disorder. *Id.* at 100-05. However, the history and characteristics of Defendant provide little mitigation for her conduct. As recently as March 10, 2025, when Defendant was interviewed by the Probation Office, she reported her role in the scheme as prior "legitimate" employment. *Id.* at 86, 115. "From October 2020 until October 2023, the defendant 'assisted software engineers' and earned $6,000 monthly. The company [which she did not identify] is "gone". She advised this company is the one at the basis of the instant federal offense." *Id.* at 115. Despite entering a guilty plea with this Court, Defendant does not seem to understand the full extent of her culpability in the criminal conspiracy.

**C. The Need to Promote Respect for the Law, to Afford Adequate Deterrence, and to Protect the Public.**

In order to promote respect for the law, it is necessary and appropriate to impose a meaningful sentence. Defendant had an essential role in a complex fraud to raise funds for the North Korean regime. This scheme, and others like it that involve North Korean individuals fraudulently obtaining employment with U.S. companies as remote IT workers, using false, stolen, and borrowed U.S. identities, would not be successful without a willing U.S.-based facilitator, like Defendant, who operated their computers and accepted their paychecks. North Korean IT workers leverage U.S.-based facilitators for essential components of the scheme, including establishing a U.S. internet connection by ensuring U.S. company laptops are received on their behalf by the facilitator and setting up U.S. company laptops including remote desktop application installation.

A sentence that is too lenient would convey the wrong message to both North Koreans and current and future U.S.-based facilitators that this conduct is tolerated in the U.S. and worth the risk of being caught by U.S. law enforcement. Rather, the Court should send the message that participation in these schemes and related violations of law have serious consequences so that future would-be facilitators will be adequately deterred.

**D. The Need to Avoid Unwarranted Sentencing Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.**

In general, there are few other cases in which a U.S.-based facilitator has been sentenced in a similar scheme, primarily due to the nature of the scheme itself and the increase in fraud due to the move to online job platforms during the COVID-19 pandemic. However, the government also notes that Defendant's case is one of the largest schemes ever charged by the Department of Justice, involving over 311 businesses, 68 U.S. persons whose identities were stolen, and $17.1 million in revenue for the North Korean regime. *Compare, e.g.*, Justice Department Announces

16

Coordinated, Nationwide Actions to Combat North Korean Remote Information Technology Workers' Illicit Revenue Generation Schemes (June 30, 2025), *available at* https://www.justice.gov/opa/pr/justice-department-announces-coordinated-nationwide-actions-combat-north-korean-remote (last visited July 7, 2025) (discussing various cases charged in other districts, none with more than $1 million in revenue and not more than 100 companies total), *and* https://www.justice.gov/opa/pr/two-north-korean-nationals-and-three-facilitators-indicted-multi-year-fraudulent-remote (last visited July 7, 2025) (discussing a scheme charged in Miami, FL, with $866,255 in revenue and 64 companies). As this case represents one of the more egregious fraud schemes, a sentence at the high end of the agreed upon range is warranted.

## CONCLUSION

Wherefore, the government recommends that Defendant a total sentence of 111 months of incarceration (87 months on Counts Two and Six each (concurrent), 24 months on Count Four (consecutive)), 36 months of supervised release, and a special assessment of $300. The government also requests a money judgment in the amount of $176,850.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Karen P. W. Seifert (N.Y. Bar No. 4742342)
Assistant United States Attorney

*/s/ Ashley Pungello*
Ashley R. Pungello (D.C. Bar No. 1735733)
Trial Attorney
Computer Crime and Intellectual Property Section
Criminal Division
U.S. Department of Justice

17